## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Louis Tousignant, as Trustee for the Next-
of-Kin of Clifford Tousignant,

                Plaintiff,

v.

Kanan Enterprises, Inc., d/b/a/ King Nut
Companies,

                Defendant.

**MEMORANDUM OF LAW &
ORDER**

Civil File No. 09-919 (MJD/JSM)

Joseph E. Flynn and Susan Steffen Tice, Jardine Logan & O'Brien PLLP, Counsel
for Plaintiff.

Bruce T. Clark and William D. Marler, Marler Clark, Pro Hac Vice, Counsel for
Plaintiff.

Sarah L. Brew, Faegre & Benson LLP, Counsel for Defendant.

## I.      INTRODUCTION

This matter is before the Court on Defendant Kanan Enterprises, Inc.'s

Motion for Summary Judgment.  [Docket No. 19]  Oral argument was heard

Friday, April 15, 2011.

## II.     FACTUAL BACKGROUND

## A. Clifford Tousignant

From December 2008 to January 2009, the decedent, Clifford Tousignant, was living at the Woodland Good Samaritan Village nursing facility in Brainerd, Minnesota.  He moved into this facility on November 14, 2008.  During his residency at Woodland Good Samaritan Village he was served and consumed Defendant Kanan Enterprises, Inc.'s ("Kanan") King Nut brand peanut butter.  In late December 2008, he became ill and began suffering serious gastrointestinal issues, later confirmed to be the result of a Salmonella Typhimurium infection. As a result of this illness, he was hospitalized on December 31, 2008, and remained hospitalized until January 4, 2009, when the diarrhea he was suffering decreased.  He was transferred back to Woodland Good Samaritan Village, but his symptoms continued, and on January 11, 2009, he was found unresponsive in his room.  On January 12, 2009, Mr. Tousignant died.  The death certificate lists Salmonella gastroenteritis as the primary cause of death, and further lists diabetes mellitus with neuropathy and chronic thrombocytopenia as contributing conditions.

## B. Kanan's Business with Peanut Corporation of America

Kanan is a family owned business which has done business as King Nut Company since 1989.  Kanan is a leading supplier of snack nuts and other items to the airline, retail, vending, food, gift, and private label industries.  As Kanan's business expanded, customers began to ask Kanan to supply them with peanut butter in industrial size 5-pound and 35-pound containers.  Kanan is not a peanut butter manufacturer however, and so it searched to find a company who would be able to supply a "private label" peanut butter.  Private labeling means that the manufacturer would sell Kanan sealed containers of high quality peanut butter with Kanan's King Nut brand label, packaged in a closed and finished case.  Kanan would not be involved in the manufacturing, processing, or packaging of the peanut butter.

Ultimately, Kanan began working with Peanut Corporation of America ("PCA"), who was a well-known supplier to food manufacturers, such as Kellogg, Inc.  For five years, PCA private labeled 5-pound containers of creamy and crunchy peanut butter with the King Nut label.  Additionally, Kanan purchased 35-pound containers of Parnell's Pride creamy peanut butter from PCA.

Throughout the years Kanan was doing business with PCA, Kanan was provided documentation from PCA assuring the quality and safety of its peanut butter.  For example, PCA provided Kanan with a specification sheet which required that no Salmonella be present in the product.  PCA also provided Kanan with Continuing Pure Food Guarantees, which promised that the peanut butter was manufactured free from any substances "which are poisonous, pathogenic, unlawful, toxic or in any way injurious."  Eventually, PCA began providing Kanan Certificates of Analysis ("COAs") which showed that the peanut butter delivered to Kanan had been tested for Salmonella, and that the tests were negative for Salmonella.

### C.  2008-2009 Salmonella Outbreak and Recalls

On January 9, 2009, the Minnesota Department of Agriculture ("MDA") announced a product advisory after the MDA's preliminary lab testing indicated the presence of Salmonella in a five-pound container of King Nut brand creamy peanut butter.  On January 10, 2009, Kanan initiated a voluntary recall of all their peanut butter products made from PCA peanuts.

On January 13, 2009, PCA announced a voluntary recall of peanut butter produced in its facility in Blakely, Georgia.  The Food and Drug Administration

("FDA") then informed PCA that samples of its products coming from the

Blakely, Georgia plant had tested positive for Salmonella in Minnesota, Georgia,

and Connecticut.  On January 16, 2009, PCA expanded its voluntary recall to

include all peanut butter produced on or after August 8, 2008, and all peanut

paste produced on or after September 26, 2008, in the Blakely plant.  Eventually,

PCA recalled all peanut butter, peanut paste, and peanuts products produced

after January 1, 2007.

Following the Salmonella outbreak, the FDA determined that the source of

the contamination was PCA's Blakely, Georgia facility.  Representatives of the

FDA inspected the plant, and on January 29, 2009 released a report concerning

that investigation.  The report contained a number of findings, including that

PCA knowingly shipped contaminated products, PCA failed to establish a

roasting process that would ensure there was no Salmonella contamination, PCA

stored finished roasted peanuts in places exposed to water and mold, as well as

many other findings concerning the unsanitary conditions at the plant.

### D. PCA Files for Chapter 7 Bankruptcy

Due to the Salmonella outbreak, and the resulting recalls, many suits were

filed and claims were asserted against PCA.  Shortly after the outbreak, PCA

filed for bankruptcy under Chapter 7 of the Bankruptcy Code.  Persons infected

with Salmonella had claims for personal injury ("Tort Claims") against PCA,

while manufacturers and distributors had claims against PCA for compensation

concerning the costs incurred due to the recall of products ("Recall Claims").

Additionally, many companies, like Kanan, who were being sued by injured

customers had claims for contributions and indemnity against PCA

("Contribution Claims").

### E.  Plaintiff Commences Lawsuit with this Court and PCA Bankruptcy Settlement and Distribution Procedures Agreement

On April 21, 2009, Plaintiff Louis Tousignant filed a wrongful death

lawsuit in this Court [Docket No. 1].  The Complaint alleges four claims against

Kanan: (1) Strict Liability; (2) Breach of Warranty; (3) Negligence; and (4)

Negligence Per Se.  Plaintiff did not bring any claims against PCA in this Court,

because any claims against PCA had been stayed when PCA filed for

bankruptcy.

In an attempt to avoid individually litigating all of the claims against PCA,

as well as coverage claims between the Bankruptcy Estate and PCA's insurer,

Hartford Insurance, the Trustee elected to seek a global resolution of claims.

Following negotiations between the Trustees, counsel for the claimants, Hartford

Insurance, Kanan, and Kellogg, a plan to attempt to settle the various claims was

devised and written up in a document entitled PCA Salmonella Claim Settlement

and Distribution Procedures ("Settlement and Distribution Procedures").

Pursuant to this agreement, Hartford Insurance agreed to pay the Trustee

$12,750,000, of which $12,000,000 was to be used as payment of the Tort Claims

("BI Claims Fund").  In order for seek a claim against PCA and the BI Claims

Fund, plaintiffs were required to participate in the claims process described in

the Settlement and Distribution Procedures.

The Settlement and Distribution Procedures provide in part:

3.4.4 Litigation

Any eligible claimant with a claim that involves a manufacturer or
distributor who participates in the process described above, but
whose claim is not resolved, shall have the right to pursue a claim in
a state or federal court of competent jurisdiction against any
manufacturer or distributor whose product is implicated.

* * *

3.6 Participation by Kellogg and Kanan

KG (Kellogg) and KN (Kanan) have agreed to participate in the
claims resolution process described in this Procedure to address
eligible claims in which KG or KN, respectively, are implicated.

KG, KN, and any other manufacturer or distributor who participates
in the claims resolution process shall retain the right to assert any

causation defense to any claim, including damages, but shall be held
to a strict liability standard as to any eligible claim implicating their
respective products where causation is proved.

* * *

4.2 Claims Settled as to the BI Fund

In the event that the claims resolution process results in an
agreement as to the amount to be paid from the BI Claims Fund, but
not in a settlement with a manufacturer or distributor of the product
ingested, the claimant shall execute a release prepared by the
Trustee by which the claimant releases any and all claims which it
has or may have against the Trustee . . . the BI Claims Fund [and]
PCA. . . . Such release shall specifically exclude a release of any
manufacturer or distributor of the product ingested by claimant . . . .

(Clark Aff. Ex. 3.)

Pursuant to this process, manufacturers and distributors, such as Kellogg

and Kanan, with Recall and Contribution Claims against PCA would not be able

to recover any money from the BI Claims Fund.  However, they would be

allowed to participate in the settlement process alongside the BI Claims Fund in

an attempt reach a complete settlement of the Tort Claims.

In August 2009, Plaintiff and Kanan stipulated to stay the matter before

this Court "until Plaintiff decides whether to participate in the PCA Settlement

Procedure ordered by the Bankruptcy Court or to pursue this action."  (Docket

No. 7)  The Court's Order stated "[i]f, as the parties anticipate, the Bankruptcy

8

Court enters an order adopting the PCA Settlement Procedure, or similar

procedures, Plaintiff must then decide whether to participate in that procedure

or, instead, to pursue his claims against Defendant Kanan in this action."  (Id.)

Plaintiff chose to participate in the settlement process, and on February 5, 2010,

this Court ordered the Clerk of Court to administratively terminate the action

"without prejudice to the right of any party to move to reopen the proceedings

for good cause shown, for the entry of any stipulation or order, or for any other

purpose required to obtain a final determination of the litigation."  (Docket No.

8.)

### F.   Plaintiff's Settlement in the Bankruptcy Court

On August 6, 2010, Plaintiff moved the United States District Court for the

Western District of Virginia to approve his settlement with PCA, in the amount

of $217,254.57.  A copy of the Settlement Agreement between PCA and Plaintiff

was attached to this motion.  On August 17, 2010, Plaintiff filed an Amended

Motion for approval of the Settlement Agreement which was signed by the

beneficiaries of Clifford Tousignant's estate.  In the Amended Motion, it states

that the proposed settlement between Plaintiff and PCA "does not include

compromise of any claims that the Estate and beneficiaries may have against

Kanan Enterprises (d/b/a King Nut) and such claims are expressly intended to be preserved under Minnesota law as reflected in the Settlement Agreement and Release."  The Settlement Agreement itself however, listed Kanan as a "Debtor Releasee," and went on to state that "[i]n consideration of the payments set forth in Section 2, Plaintiff/Releasor hereby completely releases and forever discharges Debtors/Releasees."  Although Kanan is listed as a "Debtor/Releasee," Kanan did not execute the Settlement Agreement, as is evidenced by Kanan's blank signature line at the end of the document.

The Settlement and Distribution Procedures recognized that "the payment of amounts which will constitute the BI Claims Fund . . . is dependent upon the Bankruptcy Court approving the Settlement Agreement.  Depending on the number and amount of eligible claims filed, the BI Claims Fund may not be sufficient to pay all PCA Salmonella Claims in full."  (Clark Aff. Ex. 3, ¶ 1.4.)  In order to address this concern it was agreed that claimants whose Tort Claims against PCA also involved claims against product manufacturers or distributors would receive 79.0016% of the value of their claim as determined by the claims administrator.  Ultimately, the full value of the valid claims asserted against PCA was determined to be $15,000,000, an amount greater than the BI Claims Fund.

In accordance with the Settlement and Distribution Procedures, the

settlement amount Plaintiff and PCA agreed upon represented a pro rata

reduction of Plaintiff's claim such that Plaintiff received 79.00166% of the full

claim value.  Although Kanan was involved in creating the settlement process, it

was noted by the Magistrate Judge that it appeared that Kanan had "not taken

advantage of this [settlement procedure] opportunity."  (Clark Aff. Ex. 1 at 3.)

The Magistrate Judge further stated that "[n]o settlements were reached by any

minor claimant or wrongful death claimant with Kanan, Inc."  (Id. at 4.)

On September 13, 2010, the Settlement Agreement was approved.  The

Order stated:

> compromise settlement of the claims for the injuries and death of
> Clifford Tousignant, deceased, for the amounts reflected in the
> Amended Motion, and the distribution of these settlement proceeds
> as set forth above and as agreed to by the interested parties and
> reflected in the Amended Motion, is just, fair, and reasonable and in
> the best interests of the decedent's estate and the person entitled to
> recover damages; and that the proposed compromise settlement
> should be approved.

(Brew Aff. Ex. 4.)  The Order did not make any reference to Plaintiff's claims

against Kanan being preserved.  The Order did however state that the payment

operated as a full and complete release against "the Releasees".  (Id. at 3.)

**G. Reopening of the Case at Hand**

11

After approval of the Settlement Agreement, Plaintiff filed a Motion to Rescind Administrative Termination and Activate and Re-Open Case with this Court on September 17, 2010.  [Docket No. 9]  On September 28, 2010, the Court entered an Order Reopening Case.  [Docket No. 12]  The Court's Order stated that "[t]his case had been previously administratively terminated by Court Order dated February 5, 2010, because the proceedings had been stayed pending the disposition of a bankruptcy proceeding."  Further, the Order provided that "[t]he Court is now advised that the bankruptcy proceeding has concluded and that Plaintiff wishes to proceed with his claims against Defendant Kanan."  On February 4, 2011, Kanan filed a Motion for Summary Judgment.  [Docket No. 19]

## III.   DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

12

Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary will not be counted. Id. "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

**B. Application Minn. Stat. § 544.41 to Plaintiff's Strict Liability Claim**

Minn. Stat. § 544.41, known as the seller's exception statute, limits the strict liability of a passive distributor in a products liability case. This statute "tempers the harsh effect of strict liability as it applies to passive sellers, while ensuring that a person injured by a defective product can recover from a viable source." In re Shigellosis Litigation, 647 N.W.2d 1, 6 (Minn. Ct. App. 2002). The statute achieves this goal by requiring the dismissal of strict liability claims against non-manufacturers under certain situations. The statute provides in part:

**Subdivision 1. Product liability; requirements.**  In any product liability action based in whole or in part on strict liability in tort commenced or maintained against a defendant other than the manufacturer, that party shall upon answering or otherwise pleading file an affidavit certifying the correct identity of the manufacturer of the product allegedly causing injury, death, or damage. . . .

**Subdivision 2. Certifying defendant; dismissal of strict liability.** Once the plaintiff has filed a complaint against a manufacturer and the manufacturer has or is required to have answered or otherwise pleaded, the court shall order dismissal of a strict liability in tort claim against the certifying defendant, provided the certifying defendant is not within the categories set forth in subdivision 3. Due diligence shall be exercised by the certifying defendant in providing the plaintiff with the correct identity of the manufacturer and due diligence shall be exercised by the plaintiff in filing a law suit and obtaining jurisdiction over the manufacturer.

Minn. Stat. § 544.41.

The statute prohibits dismissal of a defendant if the plaintiff can show:

(a) that the defendant has exercised some significant control over the design or manufacture of the product, or has provided instructions or warnings to the manufacturer relative to the alleged defect in the product which caused the injury, death, or damage;

(b) that the defendant had actual knowledge of the defect in the product which caused the injury, death, or damage; or

(c) that the defendant created the defect in the product which caused the injury, death, or damage.

14

Minn. Stat. § 544.41, subdiv. 3.  Additionally, the statute provides that a plaintiff may move to vacate a dismissal order and reinstate a certifying defendant when the plaintiff can show one of the following:

> (c) that the manufacturer no longer exists, cannot be subject to the jurisdiction of the courts of this state, or despite due diligence, the manufacturer is not amenable to service of process;
>
> (d) that the manufacturer is unable to satisfy any judgment as determined by the court; or
>
> (e) that the court determines that the manufacturer would be unable to satisfy a reasonable settlement or other agreement with plaintiff.

Minn. Stat. § 544.41, subdiv. 2.

Kanan asserts that it has satisfied all of the requirements of Minn. Stat. § 544.41, and accordingly argues that Plaintiff's claim against Kanan for strict liability is subject to dismissal.  Kanan argues that it is precisely the type of defendant intended to be protected by this statute.  However, Minn. Stat. § 544.41, subdiv. 2(c) states that dismissal of a non-manufacturer is not appropriate where the manufacturer cannot be subject to the jurisdiction of the Court.  It is undisputed that PCA is not subject to this Court's jurisdiction because PCA is in bankruptcy.  Plaintiff did not name PCA as a defendant in the case at hand because by the time the case had been filed PCA had declared bankruptcy.

Furthermore, because PCA has filed Chapter 7 bankruptcy, Plaintiff cannot be

subject to suit in this Court.  Thus, PCA has never been, and cannot become a

party to this case.  As the court stated in In re Shigellosis Litigation:

> The plain language of the seller's-exception statute requires that the
> identified manufacturer be served with process prior to dismissal of
> strict-liability claims against the passive seller.  And it further
> requires that, before dismissal, the manufacturer must have
> responded or have the obligation to respond.  Dismissal is not
> appropriate if the plaintiff's action cannot reach a manufacturer or
> the manufacturer is insolvent.

647 N.W.2d at 6.  Thus, because PCA is not subject to this Court's jurisdiction,

dismissal of Kanan through the application of Minn. Stat. § 544.41 is not

appropriate.

Kanan argues that the fact that PCA has declared bankruptcy does not

affect the applicability of Minn. Stat. § 544.41 in this case, because Plaintiff cannot

show "that the manufacturer would be unable to satisfy a reasonable settlement"

because Plaintiff has already, as a matter of law, received a reasonable settlement

from PCA through the bankruptcy proceedings.  See Minn. Stat. § 544.41, subdiv.

2(e).  Kanan argues that the fact that a manufacturer is insolvent and in

bankruptcy is not dispositive on the issue of whether a plaintiff can secure a

reasonable recovery from that manufacturer, and directs the Court to Kladivo v.

Sportsstuff, Inc., Civil No. 06-4924 (JRT/RLE), 2008 WL 4933951 (D. Minn., Sept.

2, 2008).  Kladivo is distinguishable, however, from the case at hand.  In Kladivo,

the court held that the manufacturer's filing of Chapter 11 bankruptcy was not

sufficient to show that the manufacturer would be unable to satisfy a judgment

or settlement.  Id. at *3.  The aims of Chapter 11 bankruptcy, however, are

fundamentally different from Chapter 7 bankruptcy.  "Whereas the aim of a

Chapter 7 liquidation is the prompt closure and distribution of the debtor's

estate, Chapter 11 provides for reorganization with the aim of rehabilitating the

debtor and avoiding forfeitures by creditors."  Pioneer Inv. Serv. Co. v.

Brunswick Assoc. Ltd. P'ship, 507 U.S. 380, 356 (1993).  Thus, the court in Kladivo

anticipated that because the manufacturer was in Chapter 11 bankruptcy,

eventually the manufacturer would be subject to the Court's jurisdiction.  Id.  In

contrast, in the case at hand, PCA filed for Chapter 7 bankruptcy and ceases to

exist, and cannot therefore be subject to the Court's jurisdiction in the future.

Since this Court does not have jurisdiction over PCA, dismissal of Kanan is

inappropriate, and Kanan's motion for summary judgment on this ground is

denied.  Accordingly, because the Court finds that application of Minn. Stat. §

544.41 is not appropriate in this case, the Court will not address Kanan's

arguments concerning whether or not the settlement reached constitutes a

reasonable settlement under § 544.41.

### C. Release of Kanan by Plaintiff's Settlement Agreement

Kanan also argues that it is entitled to summary judgment because

Plaintiff's settlement agreement explicitly released all claims against Kanan. The

settlement agreement lists "Kanan Enterprises, Inc." as a "Debtor/Releasee."  The

Settlement Agreement states that all claims against "Debtor/Releasees" were

released and discharged by PCA's $217,254.57 payment.  (Id. at 1-2.)

The terms of the Settlement Agreement are to be construed in accordance

with Virginia law.  Kanan argues that there is no ambiguity in the terms of the

Settlement Agreement, as the agreement states a clear intent to release Kanan.

Kanan asserts that the terms of the Settlement Agreement give Kanan the status

as a third-party beneficiary releasee with standing to enforce the terms of the

Settlement Agreement.  Under Virginia law, "[a]n agreement will be enforced in

favor of a third party beneficiary when the beneficiary establishes that the parties

to the agreement clearly and definitely intended to confer a benefit on the

beneficiary."  First Sec. Fed. Sav. Bank Inc. v. McQuilken, 480 S.E.2d 485, 488 (Va.

1997).  Kanan asserts that by including Kanan as a "Debtor /Releasee" the parties

to the settlement Agreement clearly and definitely intended to confer a benefit on Kanan, namely the release of Plaintiff's claims against Kanan.  The Court disagrees.

It is clear from looking at the Settlement Agreement that if Kanan was intended to be a beneficiary it was as an actual party to the agreement, as opposed to a third party beneficiary.  This is evidenced by the fact that in the Settlement Agreement there is a place for Kanan to sign, which is blank.  If Kanan was intended to be a third party beneficiary to the Settlement Agreement, there would be no need for Kanan to execute the document, and thus, there would be no need for a signature line for Kanan in the document.  Where an agreement, such as the Settlement Agreement, clearly indicates that a party is to execute the document, it does not logically follow that without executing the document that party is still entitled to enforce the agreement as a third party beneficiary.  Contrary to a finding that "the parties to the agreement clearly and definitely intended to confer a benefit on" Kanan, it is clear that without Kanan's signature there was no intent amongst the parties to confer a benefit on Kanan. Id.  Thus, the Court finds that Kanan is not a third party beneficiary entitled to enforce the terms of the Settlement Agreement, and the Court denies Kanan's

motion for summary judgment on the basis of the purported release of Kanan in the Settlement Agreement.

### D. Plaintiff's Remaining Claims

In addition to moving for summary judgment on Plaintiff's strict liability claim, Kanan has moved for summary judgment on Plaintiff's claims of breach of warranty, negligence, and negligence per se.  Kanan's main argument is that application of Minn. Stat. § 544.41 requires dismissal of all Plaintiff's remaining claims because Minnesota law merges these claims into a single theory of strict liability.  Since the Court finds that application of § 544.41 inappropriate in this case, the Court will deny Kanan's motion for summary judgment on this ground.

Kanan further argues, in a single footnote in its memorandum of law, that Plaintiff's negligence and warranty claims are subject to dismissal for failure to state a claim.  Unfortunately, although Kanan directs the Court to a series of cases, it does so without providing any analysis or explanation of why Plaintiff's remaining claims against Kanan in the case at hand should be dismissed. Moreover, at oral argument, Kanan did not further articulate its argument that Plaintiff's remaining claims should be dismissed for failure to state a claim.

Accordingly, the Court will deny Kanan's motion for summary judgment on

Plaintiff's remaining claims.

## IV.    CONCLUSION

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

Defendant Kanan Enterprises, Inc.'s Motion for Summary Judgment
[Docket No. 19] is **DENIED**.


Date:  May 16, 2011                              s/ Michael J. Davis
                                                 Michael J. Davis
                                                 Chief Judge
                                                 United States District Court